UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EXPERIAN INFORMATION SOLUTIONS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 11 C 8927 |
| v. | ) ) | Judge Sara L. Ellis |
| CARFAX, INC., | ) ) | |
| Defendant. | ) | |

# OPINION AND ORDER

Experian Information Solutions, Inc. ("Experian"), which markets and sells vehicle history reports ("VHRs") under the trademark "AutoCheck," filed suit against its competitor, Carfax, Inc. ("Carfax"), alleging that Carfax made false and disparaging statements about AutoCheck in order to retain a contract with Subaru of America, Inc. ("Subaru"). Experian pursues claims of tortious interference with business expectancy (Count I), trade libel/false light/business disparagement (Count II), defamation *per se* (Count III), and defamation *per quod* (Count IV). Carfax filed counterclaims against Experian, alleging false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and deceptive trade practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 *et seq.*, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2 *et seq.* Before the Court is Carfax's motion for summary judgment on Experian's claims [62], which is limited to causation and harm. Because there is a genuine issue of fact as to whether Carfax's statements caused Subaru to forego its planned contract with Experian in favor of renewing its contract with Carfax, Carfax's motion is denied.

# BACKGROUND[1]

Experian and Carfax are competitors in the VHR industry. In February 2005, Carfax contracted with Subaru to provide VHRs for Subaru's Certified Pre-Owned ("CPO") program. Under the contract, Subaru dealerships were required to use Carfax reports when certifying a vehicle as part of the CPO program. The Subaru-Carfax contract ran through February 2012, at which point it was to automatically renew for additional one-year periods unless either party provided written notice of termination ninety days before the contract's anniversary date.

In 2010, Subaru discussed the possibility of using AutoCheck for its CPO program, but nothing came of those discussions. In summer 2011, as the Subaru-Carfax contract renewal date approached, Subaru's National Dealer Advisory Board ("NDAB") requested that Subaru "A. Either allow choice of either Autocheck and Carfax reports for Subaru CPO or B. Negotiate on their behalf a special unlimited VHR monthly offering [from Carfax] that is priced well under current market pricing (and similar to Autocheck)." Pl.'s Ex. 7 at SOA000038. Jim Sarchese, Subaru's National Product Manager for CPO, then reinitiated contact with Experian. Experian offered to provide Subaru a flat-fee VHR rate for Subaru dealers in addition to between $140,000 and $150,000 per year in marketing dollars if Subaru signed a contract with Experian. Subaru also conducted due diligence on AutoCheck. Patti Mickel, Subaru's Insurance Product Marketing Manager, ran thirteen VINs through AutoCheck's website to compare the results with those from Carfax. On September 23, 2011, Sarchese, Mickel, and someone from Carfax's IT department visited Experian's office in Schaumburg, Illinois. They met with John Sidman,

---

[1] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to Experian, the non-movant. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.

Experian's Director of Business Development, and Rob Bayus, Experian's Senior Business Development Specialist.[2] The next day, Sarchese emailed members of the NDAB to report that the meeting went well and that Subaru was seriously considering terminating its contract with Carfax and exclusively using AutoCheck for the CPO program, in response to the NDAB's request for a better and more affordable VHR solution.

After further discussions, Subaru decided to provide Carfax with notice of non-renewal of their agreement. Thus, on October 14, 2011, Sarchese emailed Justin Johnson, Carfax's Partner Development Director for CPO, a copy of Subaru's notice of non-renewal. That notice was also sent to Carfax's CEO by certified mail.[3] Concurrently, Subaru was working with Experian to finalize an agreement for AutoCheck. The parties discussed marketing materials and Subaru's intention to remove Carfax from its promotional materials. Experian sent Subaru a draft AutoCheck contract for review and comment on October 17th. However, Subaru never signed a CPO contract with Experian.

Instead, Carfax redoubled its attempts to save its relationship with Subaru, with the end result being that Subaru opted to sign a new contract with Carfax in 2012. On October 18th, at Johnson's request, Sarchese and Mickel met with Johnson and Joe Koenig, Carfax's Vice President of Business Development, at a Cheesecake Factory in Cherry Hill, New Jersey, near Subaru's offices. At that meeting, Johnson and Koenig offered that Carfax could conduct a survey of Subaru dealers to determine if they supported a switch to AutoCheck. Sarchese declined the offer, stating that Subaru could conduct such a survey on its own if it wanted to know what its dealers thought about AutoCheck. Sarchese also informed Johnson and Koenig that Subaru planned to sign with Experian and that Carfax should act quickly if it had anything to

---

[2] Bayus was previously one of Subaru's contacts at Carfax.

[3] The signed version was returned to Subaru as undeliverable.

3

offer. The meeting alone did not change Subaru's decision to go forward with Experian, however; Mickel and Sarchese continued conversations with Experian, even asking for AutoCheck's logo to begin designing marketing materials.

After the October 18th meeting, Johnson worked with his Carfax team to come up with a way to save the Subaru business. Johnson spoke and emailed regularly with Mickel after the meeting, although neither recalled what was specifically discussed. Johnson also attempted to find a way to obtain additional marketing dollars to allot to Subaru but initially encountered resistance. Others worked to obtain a comparative analysis of the two companies' results that could be presented to Subaru.

Carfax's efforts culminated in a fourteen-page letter from Johnson to Sarchese and Mickel, sent on October 21st. The letter began and ended with a personal appeal to Sarchese that Subaru renew with Carfax and not sign with Experian. Alternatively, Johnson suggested a short-term extension of the Carfax contract to allow the parties to work out the details. The letter proceeded to list "numerous compelling reasons why changing vehicle history report (VHR) providers for the Subaru CPO program would be a damaging choice for Subaru and would ultimately hurt sales of Subaru CPO vehicles and the growth of the Subaru CPO program." Def.'s Ex. 13 at EXP-Cx002494. The letter stated that the majority of Subaru dealers preferred Carfax and would continue to run Carfax reports even with a switch to AutoCheck, which would only increase costs. Johnson again repeated the suggestion of conducting a survey of Subaru dealers to verify his claims. Additionally, the letter highlighted Carfax's brand awareness as compared to that of AutoCheck and the fact that Carfax had access to more data and did a better job of interpreting the data it had. Specifically, Johnson stated that Carfax's "data is vastly superior and that using Autocheck will allow a significant number of problem vehicles into [the

CPO] program." *Id.* at EXP-CX002495. As substantiation, the letter pointed out that, by using Carfax, 384 vehicles had not been certified through Subaru's CPO program between October 2010 and September 2011. The letter claimed that, if AutoCheck had been used, 96 of these same vehicles would have been certified.[4] Carfax pledged to help the Subaru CPO program grow through various measures including a CPO alert, an inventory report, additional training, and field team reinforcements. Additional marketing support was also pledged, including a $25,000 marketing budget and more prominent Subaru CPO placement on Carfax's products.

Although Sarchese testified that he only skimmed the October 21 letter and viewed it as marketing fluff, he sent the letter to Bayus at Experian. Bayus then disseminated it to Sidman and David Nemtuda, Experian's Vice President of Sales, noting that the $25,000 marketing subsidy that Carfax was offering and the allegation that Experian was offering AutoCheck for as low as $199 per month for unlimited plans had caught Sarchese's attention and deserved a response. Mickel testified that she skimmed the letter when it came in but did not read it word for word. Both later denied recalling any specific statements contained in the letter.

The same day Sarchese and Mickel received Carfax's letter, Mickel suggested to Sarchese that they survey top CPO dealers to make sure they were comfortable with switching from Carfax to AutoCheck. Sarchese agreed with the suggestion. Mickel testified she thought a survey would be a good idea after noticing there was no resolution on the issue from the NDAB on Subaru's dealer portal. Sarchese and Mickel both testified that Johnson's letter did not motivate their decision to undertake the survey, but it is undisputed that the decision was made

---

[4] No Carfax employee could explain the basis for these numbers. Kim Harvey, a Carfax employee involved in running the analysis that was used as part of the data comparison, indicated that the statistics she was providing were based on information in the database as of the date the analysis was run, not on information as of the date the VINs were initially run by Subaru dealers in the time period indicated by the letter.

5

after the letter was received. In recounting the chronology of events in July 2012, Sarchese

described the decision to survey Subaru dealers as follows:

> On Oct 21st, Carfax reached out to us with the attached letter and came up to meet with us. Their contention was that despite our NDAB recommendation that the vast majority of dealers know the benefit of the Carfax brand and that we would do harm to our CPO product and to the general population of dealers wanting Carfax if we switched to lesser known Autocheck. We considered their contentions and decided that it would be prudent to poll our top CPO dealers directly to see firsthand their thoughts.

Pl.'s Ex. 50.

Sarchese and Mickel first contacted only a few dealers but then expanded the reach of the survey to seventy-seven dealerships—those that had sold at least fifty or more CPO vehicles in that year to date. As the survey progressed, a standard question was developed:

> Our National Dealer Advisory Board (NDAB) has requested that we negotiate a special unlimited vehicle history report deal with Carfax or switch to Autocheck. Carfax isn't budging, but Autocheck is offering a deal for $530 per month unlimited VHRs or a pay-per-VIN deal of $6 (Carfax is $7).
>
> You're one of our top CPO dealers in the country, what is your opinion on this important issue?
>
> A.     Switch to Autocheck, the data is just as good and easy to present to customers in place of Carfax. The unlimited plan costs savings will be a huge help.
>
> B.     Stay with Carfax, they have the name recognition, people won't accept the Autocheck report so we'll just end up having to run 2 reports (costing more $$).

Def.'s Ex. 17 at EXP-Cx000558. On October 24, Sarchese emailed Bayus and Sidman to inform Experian of the survey Subaru was conducting. He emphasized that Subaru "want[s] to justify the switch" and asked for additional time to compile and review the survey results before moving forward. *Id.* Sarchese also shared with Bayus the list of dealers who were to be surveyed. Experian then hired a third party to contact Subaru dealers on that list who were also AutoCheck

6

customers to ask for their support in encouraging Subaru to switch to AutoCheck as its official CPO VHR provider. Carfax was not involved in the survey.

Fifty-two dealerships responded to the survey, with forty-two voting to stay with Carfax and ten voting to switch to AutoCheck. On November 2, the results were sent to three NDAB members, with Sarchese noting that "with this dealer survey I would not be comfortable making the switch to Autocheck." Def.'s Ex. 21 at SOA000131. He added "I like the Experian folks and think that is the direction for the future (maybe a year or 2) but can't see it now based on the feedback." *Id.* Sarchese then met with Johnson and Mark Miskiel, another Carfax employee, on November 15th. Carfax's meeting minutes indicate that Sarchese told them that Carfax "was not necessarily the clear choice" among the dealers surveyed. Pl.'s Ex. 46 at CFX00003647.

On November 17th, Subaru informed Experian that the deal with Subaru was off. Sarchese emailed the results of the survey to Bayus and Sidman, noting that the "final outcome of the survey indicated a preference for Carfax 4 to 1 (regardless of the deal)." Def.'s Ex. 20 at EXP-Cx000638. He found the survey results to reflect "a big disconnect between what the NDAB wanted" and "what the actual CPO producers wanted," which, when presented to the NDAB, led them to "scurr[y] off." *Id.* Sarchese noted that prior to seeing the survey results, Subaru "had every intention to make the switch," but that based on the survey, Subaru would re-sign with Carfax. *Id.* He concluded by stating that he hoped Subaru would be able to partner with Experian in the near future if dealer opinion changed. Nemtuda forwarded the results of the survey to Experian's senior management team on November 22, 2011, stating that it was "the strongest data we've seen on the dealer's perception of Carfax's brand strength and its impact on CPO decision makers." Def.'s Ex. 24 at EXP-Cx002634.

7

Ultimately, Carfax and Subaru signed a two-year contract in January 2012. Both Mickel and Sarchese testified that the survey results, and nothing in the October 21st letter from Johnson, caused Subaru to pick Carfax over AutoCheck. In an email to Bayus on December 5th, Mickel stated that despite "truly liking [Bayus] and [Sidman] and [Experian], we could not risk the possibility of a negative impact on our business. We could not come up with a strong enough argument to our exec. management to go against the clear majority of our dealers." Def.'s Ex. 25 at EXP-Cx003411.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

ANALYSIS

I.  Causation

Experian's tortious interference with prospective economic advantage, commercial disparagement, and defamation *per quod* claims all require Experian to establish that Carfax's allegedly disparaging or defamatory statements caused Experian injury.  *See Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048, 403 Ill. App. 3d 549, 342 Ill. Dec. 583 (2010) (tortious interference);[5] *Unique Concepts, Inc. v. Manuel*, 669 F. Supp. 185, 190 (N.D. Ill. 1987) (commercial disparagement);[6] *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839, 221 Ill. 2d 558, 304 Ill. Dec. 369 (2006) (defamation).[7]  Per the Court's February 6, 2013 Order, Carfax's motion focuses on the causation element of these claims, arguing that Experian cannot demonstrate that the October 21st letter that Carfax sent to Subaru caused Subaru to decide to

---

[5] The elements of tortious interference with prospective economic advantage under Illinois law are (1) plaintiff had a reasonable expectation of entering into a valid business relationship; (2) defendant knew of that expectation; (3) defendant purposefully interfered with that expectation, preventing plaintiff from entering into a valid business relationship; and (4) plaintiff suffered damages as a result of defendant's interference. *Atanus*, 932 N.E.2d at 1048.

[6] To establish commercial disparagement, in addition to causation, Experian must show that Carfax made a false and disparaging statement regarding the quality of Experian's goods or services and that it suffered special damages. *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 702, 333 Ill. App. 3d 755, 267 Ill. Dec. 321 (2002); *Unique Concepts, Inc.*, 669 F. Supp. at 190. The Illinois appellate courts are split on whether the common law tort of commercial disparagement exists. *Compare Imperial Apparel Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770, 781, 367 Ill. App. 3d 48, 304 Ill. Dec. 693 (2006) (recognizing tort), *aff'd in part & rev'd in part*, 882 N.E.2d 1011 (2008), *with Becker v. Zellner*, 684 N.E.2d 1378, 1387–88, 292 Ill. App. 3d 116, 226 Ill. Dec. 175 (1997) (finding that commercial disparagement is not a viable cause of action). The common law tort is essentially codified in the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(8). *See Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n*, 494 F. Supp. 2d 934, 943 (N.D. Ill. 2007). Carfax does not challenge whether Count II is a viable claim and thus the Court proceeds to analyze it as if it is. *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 640 n.1 (N.D. Ill. 2009).

[7] The elements of a defamation claim are (1) defendant made a false statement about plaintiff, (2) defendant made an unprivileged publication of the statement to a third party, and (3) the publication caused damages. *Solaia Tech., LLC*, 852 N.E.2d at 839 (2006). Experian must also prove special damages to recover for defamation *per quod*. *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1221, 174 Ill. 2d 77, 220 Ill. Dec. 195 (1996).

sign a new contract with Carfax instead of with Experian.[8] Because Carfax broadly addresses the letter, and not specific statements in the letter, the Court will not parse whether certain statements could be said to have caused Experian injury.

Under Illinois law, proximate cause consists of two elements: cause in fact and legal cause. *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1072, 188 Ill. 2d 252, 242 Ill. Dec. 113 (1999). Carfax's conduct qualifies as the "cause in fact" of Experian's injury if it "is a material element and a substantial factor in bringing about the injury." *Id.* That will be the case where, "absent that conduct, the injury would not have occurred." *Id.* Legal cause involves foreseeability, with the relevant inquiry "whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* If the alleged conduct "does nothing more than furnish a condition by . . . which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury." *Abrams v. City of Chicago*, 811 N.E.2d 670, 675, 211 Ill. 2d 251, 285 Ill. Dec. 183 (2004). But there may be more than one proximate cause of an injury; a party cannot avoid liability just because another party also contributed to the injury even if the injury would not have occurred absent the latter party's actions. *Garest v. Booth*, --- N.E.2d ----, 2013 IL App (1st) 121845 ¶ 41 (2013). Proximate cause is generally a question for the jury. *Abrams*, 811 N.E.2d at 674.

---

[8] Carfax's memorandum could be read to challenge whether Experian can prove that Carfax engaged in an intentional and unjustified act not protected by the competitor's privilege for purposes of its tortious interference claim. *See* Doc. 63 at 13–14. But this argument is undeveloped and thus the Court will not address it here. *See United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]" (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)); *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." (quoting *Beard v. Whitley County REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988))).

Carfax argues that Experian's tortious interference, commercial disparagement, and defamation *per quod* claims fail because the October 21st letter was not material to Subaru's decision to renew its contract with Carfax instead of signing with Experian. *See The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 620, 368 Ill. App. 3d 462, 305 Ill. Dec. 807 (2006) ("In order to be liable, a defendant's interference must cause the loss or, in other words, a defendant's conduct must not only qualify as improper interference, it must also actually induce the third party to terminate its relationship with the plaintiff."). Carfax relies on Sarchese's and Mickel's testimony that the October 21st letter played no role in Subaru's decision to stay with Carfax and that the decision was based on the survey results instead. Thus, Carfax argues that the letter was neither the cause in fact nor the legal cause of Experian's injury. Experian responds that the only reason the survey was conducted was because of the misstatements in the October 21st letter and that the decision to perform the survey and the ultimate injury to Experian was a reasonably foreseeable result.

Sarchese and Mickel have denied that the letter influenced their decision, but the timing is suspicious as the decision to survey dealers came on the heels of Subaru's receipt of the letter. The wording of the survey response regarding Carfax echoes themes in Carfax's October 21st letter, raising a question of whether the letter's receipt led to the decision to undertake the survey. Additionally, Sarchese's July 2012 statement, read in the light most favorable to Experian, links the contentions in the October 21st letter, including that Subaru would harm its CPO product and its dealers if it switched to AutoCheck, to Subaru's decision to survey its dealers. And both Sarchese and Mickel have made internally inconsistent statements as to the timing of the decision to initiate the survey. Sarchese initially stated in an affidavit that the

survey began before he received the October 21st letter and Mickel initially testified it occurred several days after receiving the October 21st letter. Both clarified that the survey decision was made soon after the October 21st letter was received, but the inconsistencies call into question the credibility of their testimony. Although Sarchese and Mickel testified these inconsistencies were due to the fact that the letter was immaterial, this is an issue for the jury's determination. *See Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders.").

Carfax argues that Experian's only basis in opposing summary judgment on causation is to call into question Sarchese's and Mickel's credibility, which is not enough to create a genuine issue of material fact. *See Morgan v. SVT, LLC*, 724 F.3d 990, 999 (7th Cir. 2013) ("[A] party cannot defeat summary judgment with resort to attacks on credibility alone."); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper."). The Court finds, however, that Experian has done more than just attack Sarchese's and Mickel's credibility. As discussed above, Experian has submitted evidence that could be read to suggest that but for the statements in the letter, Subaru would not have conducted the survey and would not have signed a new contract with Carfax. The timing of the decision to undertake the survey, while not enough on its own to create an issue of fact, also suggests that, contrary to Sarchese's and Mickel's testimony, the statements in the October 21st letter may have caused Subaru to undertake the survey and ultimately not to sign a contract with Experian. *See Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) (noting in the retaliation context that "even if suspicious timing *alone* is not

enough to create a triable issue in a particular case, suspicious timing remains 'an important evidentiary ally of the plaintiff'" (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011))); *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (suspicious timing may support an inference of causation depending on the context, and "[t]he closer two events are, the more likely that the first caused the second"); *Installation Servs., Inc. v. Elecs. Research, Inc.*, No. 04 C 6906, 2005 WL 3180129, at *6 (N.D. Ill. Nov. 23, 2005) (temporal proximity was one factor from which jury could find causation with respect to tortious interference claim).

Carfax additionally argues that the chain of events linking the letter to the decision not to sign with Experian is too attenuated to be the legal cause of Experian's injury. But legal cause is largely a foreseeability issue, with the determination focused on whether a reasonable person would expect the injury to be a likely result of his or her conduct. *Galman*, 720 N.E.2d at 1072. Considering the fact that Carfax suggested a survey—not only in the October 21st letter but also in its meeting with Subaru on October 18th—as a way to retain the Subaru business in the face of the real possibility of it going to Experian, there is at least a dispute as to whether Experian's injury was reasonably foreseeable. Thus, although Experian's road to demonstrate causation is difficult in the face of Sarchese's and Mickel's testimony, the determination of whether the Carfax letter caused Subaru to survey its dealers and ultimately not to enter into the contemplated business relationship with Experian must be left to the jury.

## II. Defamation *Per Se* (Count III)

Experian's defamation *per se* claim tracks the elements of its defamation *per quod* claim, except Experian need not prove special damages. *Id.* at 1214. Instead, "statements that fall within [the] actionable *per se* categories are thought to be so obviously and materially harmful to

13

the plaintiff that injury to her reputation may be presumed." *Id.* The Court previously found that the following statements could serve as the basis for Experian's defamatory *per se* claim: (1) "AutoCheck's auction frame data is highly flawed;" (2) "using AutoCheck will allow a significant number of problem vehicles into [Subaru's] program;" and (3) "there is a good chance Auto[C]heck will miss a problem vehicle, if this happens, there is a significant probability the consumer will see the problem on the Carfax report. This could cause problems (happened to Nissan this year)." Doc. 30 at 7–10.

Carfax argues that the presumption of harm can be rebutted. *See Knight v. Chi. Tribune Co.*, 895 N.E.2d 1007, 1014–15, 385 Ill. App. 3d 347, 324 Ill. Dec. 292 (2008); *Macklem v. Pearl*, No. 10 C 830, 2011 WL 2200037, at *4 (N.D. Ill. May 31, 2011) ("[W]hile damages are presumed in an action for defamation *per se*, the amount of damages is still an evidentiary issue."). Further, Carfax contends the presumption has been rebutted in this case because Experian cannot establish any harm where the evidence demonstrates that the allegedly defamatory statements had no impact on Subaru and its decision to remain with Carfax. Experian does not dispute the fact that the amount of damages to be awarded in a *per se* case may be challenged but argues that causation plays no role. *See Knight*, 895 N.E.2d at 1015 (noting that most states allow defendants to present evidence of the plaintiff's reputation before the alleged defamation "in mitigation of damages"). The Court need not resolve the extent to which causation may be relevant to the amount of damages if Experian establishes the remaining elements of its defamation *per se* claim, however. Even if causation does play a role, it would merely limit the amount of damages, not preclude the award of damages altogether. *See Dail v. Adamson*, 570 N.E.2d 1167, 1169, 212 Ill. App. 3d 66, 156 Ill. Dec. 445 (1991) ("[W]hile nominal damages are presumed, substantial damages are not so presumed[.]"). Moreover, the

Court has found there to be an issue of fact as to causation, as discussed above. Thus, summary judgment on the defamation *per se* claim is not appropriate on this basis.[9]

Alternatively, Carfax asks the Court to limit the damages that may be awarded on this claim to a nominal amount. The Court is unwilling to place such a limit on the potential damages at this time. Proper jury instructions will be crafted to guide the jury in its assessment of the appropriate damages award if Experian prevails on its defamation *per se* claim.

## CONCLUSION

For the foregoing reasons, Carfax's motion for summary judgment [62] is denied.

Dated: May 29, 2014

                                                                   SARA L. ELLIS
                                                                   United States District Judge

---

[9] In its reply, Carfax also argues that Experian has not established that the allegedly defamatory statements were published to a third party. This argument was footnoted in Carfax's opening memorandum of law, with Carfax arguing that Experian could not demonstrate that Sarchese or Mickel actually read the statements at issue. But there is at least a question of fact on this, as Sarchese and Mickel testified that they skimmed the October 21st letter when they received it and Sarchese forwarded the letter to Bayus, who noted that certain parts of the letter had caught Sarchese's attention.